Parsons, C. J.
The first question referred to our consideration *358 in this case arises upon the construction of the two deeds, whether the flats did or did not pass by them. The plaintiff’s construction of the first deed is, that running to the shore is running to low water mark, and running by the shore is running by low [ * 438 ] water mark ; and, * to support this construction, he relies on a maxim of our common law, that the proprietor of land adjoining on the sea or salt water, where the sea ebbs and flows, shall hold to low water mark, where the sea does not ebb more than one hundred rods, which it is agreed, by the parties in this case, it does not. The origin of this maxim, and the true construction of it, first require our consideration.
By the common law of England, which our ancestors brought with them, claiming it as their birthright, the owner of land bounded on a fresh water river owned the land to the centre of the channel of the river, as of common right; but if his land was bounded on the sea, or on any arm of the sea, where the tide ebbed and flowed, he could not, by such boundary, hold any land below the ordinary low water mark ; for all the land below belonged of common right to the king. But the subject might claim the land below high water mark against the king, either by grant, or by prescription, which presupposed a grant.
When our ancestors emigrated to this country, their first settlements were on harbors or arms of the sea; and commerce was among the earliest objects of their attention. For the purposes of commerce, wharves erected below high water mark were necessary. But the colony was not able to build them at the public expense. To induce persons to erect them, the common law of England was altered by an ordinance, providing that the proprietor of land adjoining on the sea or salt water, shall hold to low water mark, where the tide does not ebb more than one hundred rods, but not more where the tide ebbs to a greater distance.
This ordinance was annulled with the charter by the authority of which it was made; but, from that time to the present, a usage has prevailed, which now has force as our common law, that the owner of lands bounded on the sea or salt water shall hold to low water mark, so that he does not hold more than one hundred rods below high water mark; but the rights of others to convenient ways are saved, agreeably to a provision in the ordinance. [*439 ] * This rule applies only in cases where the grantor, seised of the upland and flats, in conveying his land, bounds the land sold on the sea or salt water, or describes other boundaries of equivalent meaning, without any reservation of the flats. But the owner may sell his upland without the flats, or the flats, or any part thereof, without the upland.
*359 The present question is, therefore, a question upon the construction of the deeds of conveyance. The lands are not expressly bounded on the sea or salt water; but they extend to the seashore, and are bounded by it; which, as the plaintiff has argued, are expressions of the same import.
What is the sea-shore, must first be defined. The sea-shore must be understood to be the margin of the sea, in its usual and ordinary state. Thus, when the tide is out, low water mark is the margin of the sea; and when the sea is full, the margin is high water mark. The sea-shore is therefore all the ground between the ordinary high water mark and low water mark. It cannot be considered as including any ground always covered by the sea ; for then it would have no definite limit on the sea-board. Neither can it include any part of the upland, for the same reason. This definition of the shore seems to result necessarily from its nature and situation.
But we are not left without any authority. This question is largely considered by Lord Hale in his treatise De Jure Maris et Brachiorum ejusdem. And his definition of the sea-shore is, “ that ground that is between the ordinary high water mark and low water mark.”
We must now return to the first deed; and as it appears from the report of the judge, that the shore mentioned in the deed is not covered with rock, but forms a beach or flats, we shall for shore substitute flats. The land described will then extend to the flats, and be bounded by the flats. On this substitution the construction is manifest. The land conveyed extends to the flats, but not over them ; and the flats, being a bound of the land conveyed, are not a part * of it. Thus, by a strict and technical con- [ * 440 ] struction of the description of the land conveyed, we are satisfied that no part of the flats passed by the first deed.
The description in the second deed varies in one respect from the description in the former deed. In the first deed, the course runs to the shore, and thence by the shore. In the second deed, let us substitute flats for shore, and the course will run to a heap of stones by the flats at Elwell’s Corner, and thence by the flats to the land described in the first deed. Elwell's Corner not being located by any evidence or admission, we cannot presume that the first course extended over the flats to that corner; for, especially when, being satisfied that, by the technical construction of the first deed, the flats were not conveyed, we observe that the boundary line from Elwell’s Corner runs by the flats to land which passed by that deed. For we cannot presume that this boundary line crossed the flats in its course. Adhering, therefore, to a technical construction *360 of the two deeds, unassisted by any parol testimony to explain latent ambiguities, we are satisfied that the plaintiff has no title to the flats, derived under the two deeds of Abigail Dyer, or under either of them.
Another question reserved was, whether the defendant could, by oral testimony, explain the extent of the grants made in said deeds. In what manner he proposed to explain them is not stated. Unquestionably he could give no parol evidence, either to contradict the deeds, or to explain any patent ambiguities. These ambiguities must be removed by a sound construction of the words of the deed. But he might give paroi evidence to explain any latent ambiguities. Thus he might locate all the land and monuments referred to as boundaries. - But upon our construction of the deeds, he had no occasion for any paroi explanation.
There is one latent ambiguity, which might possibly be so explained by paroi evidence, as would change our opinions upon the construction of the deeds. And we men-[*441 ] tian *it, that the plaintiff, if he should again try this cause, may be prepared for the explanation, if the facts are with him.
In the second deed, a boundary line is described to run to a heap of stones by the shore at Elwell’s Corner. The shore has two sides, high water mark and low water mark. Elwell’s Corner is described as a known monument. If it is at low water mark, it is by the shore, as well as if it was at high water mark. Now, if it be a fact, that this corner was a known monument at low water mark, the plaintiff might be admitted to prove it by oral testimony. Then the boundary line, running to Elwell’s Corner, would cross the flats to low water mark; and the next boundary line running by the flats must run by the same side of the flats on which Elwell’s Corner stands; and thus the flats would be included by the boundaries of the land conveyed by the second deed. And further, from this fact, the first deed would receive a different consideration, as it was executed by the same grantor. For, as the boundary line running from Elwell’s Corner runs to the land conveyed by the first deed, if that line run by the low water mark, then the land conveyed by the first deed must also extend to low water mark; and we should presume that the word shore was used untechnically, and without legal accuracy, as importing low water mark.
As the case is now presented to us, the verdict must be set aside, and a new trial be granted.