Shaw, C. J.
The question in this case is probably one of very little importance to the parties in point of amount, but it presents a question of considerable interest to the inhabitants of the maritime districts of the state. The statement of facts is so shaped, as to present the single question of the right of an inhabitant of Duxbury to enter upon the shore or flats, between high and low water mark, lying in front of land, the acknowledged property of another, and within one hundred rods of high water mark, for the purpose of taking and carrying away clams therefrom.
The action is trespass quare clausum, and the facts find that the defendants did not pass over, or enter upon the plaintiffs’ upland, but that they passed to the place from tide water in a boat, dug five bushels of clams, and placed them in their boat, and went away and carried the clams in their boat. It follows, of course, that they must have gone to the spot whilst the flats were so much covered, with tide water as to float the boat, waited till low water, then dug the clams, and then waited until there was sufficient flood tide again to float their boat. This is the breach of the plaintiffs’ close, of which they complain.
There is no doubt, that by the common law of England all the subjects of the king have a common and general right of fishing in the sea, and in all bays, coves, branches and arms of the sea, which in general is held to extend to all places where tide ebbs and flows. The general rule is expressed by lord Hale, De Jure Maris, Hargr. Law Tracts, 11, that all the people of England have a liberty of fishing in the sea, as of common right, and of this they cannot be lawfully deprived, even by the grant of the king. Carter v. Murcot, 4 Bur. 2162; Warren v. Matthews, 1 Salk. 357. This was conceded by all the judges, although divided in opinion in other respects, in the case of Blundell v. Catterall, 5 B. & Ald. 268.
And it is not at all inconsistent with this common and general right, that the king is held to be owner of the soil under the sea. which royal right, by the common law of Eng *352 land, extends over the shore where the tide ebbs and flows to ordinary high water mark. And it has been frequently held, that the king takes this right of soil in trust for the public, so far as the fishing is concerned; and although the king may grant away this right of soil to another, yet his grantee will take it subject to the same trust; and by such grant, however comprehensive in its terms, the public, that is, the king’s subjects, cannot be deprived of their common right. This distinction between the jus privatum of the crown and the jus publicum of the people, is strongly stated by lord Hale, He Portibus Maris, and is confirmed in recent. cases of high authority. Attorney General v. Burridge, 10 Price, 350; Attorney General v. Parmeter, 10 Price, 378; Parmeter v. Attorney General, 10 Price, 412.
In some of the cases, it has been held that one may have an exclusive right of fishing in an arm of the sea; but this is not so primé facie, and must be proved by ancient grant. And it has been repeatedly held that such right cannot be founded on the king’s grant, made within the time of memory; and that no such right could be conferred by authority of the crown under Magna Charta. 2 Bl. Com. 39; Warren v. Mathews, 6 Mod. 73; Somerset v. Fogwell, 5 B. & C. 884.
The right of fishing in the sea, and in bays, arms of the sea, and in navigable or tide waters, under the free and masculine genius of the English common law, is a right, public and common to every person. 3 Kent Com. (6th ed.) 413. The same doctrine is stated and enforced by a large citation of authorities in 2 Dane Ab. 690, and in Angell on Tide Waters, (2d ed.) 125, & seq.
In stating the principles, that by the common law the right of fishing may be public, although the soil in which it is used is private property, it is proper to add, that this public right may be regulated and abridged by the legislature, who have the control and guardianship of all public rights. In England this is often done by act of parliament, regulating ports and harbors, and authorizing wharves, docks, and other erections, which to some extent may abridge the public right of fishing. This is usually done in consideration of greater public good *353 expected from such inclosures. The King v. Montague, 4 B. & C. 598.
This common and general right of fishing in the sea and its shores, at common law, being established, we think it is equally well determined by the authorities, that this right extended 'to shell fish, as well those which are embedded in the soil as those which lie on the surface. Bagott v. Orr, 2 Bos. & Pul. 472; Martin v. Waddell, 16 Pet. 414; Peck v. Lockwood, 5 Day, 22.
Assuming that this was a common law right for all English subjects at the time of the emigration of our ancestors, we have no doubt, that by the charters of Charles I. and James L, under which the land of the colony of Massachusetts was granted, for the purpose of founding a colonial government of English subjects, all the rights to the sea and sea-shores, with the incidental rights of fishing, were granted to the colonists. It is unnecessary to inquire, whether the Jus publicum, so far as general control and protection were concerned, remained to the crown or not; all the right, both to the soil under the sea, as far as by the law of nations one government is conceded to hold an exclusive right to the sea-coasts, and to the shores and arms of the sea, where the sea ebbs and flows, did vest in the grantees under those charters. Whatever right or jurisdiction, if any, remained in the crown after those grants, it is clear that it ceased on the establishment of independence, and has remained absolute in the states. Pollard v. Hagan, 3 How. 212; Gough v. Bell, 1 Zab. 156.
If, then, the right of fishing on the shores of the sea, including the right to take shell fish from the soil, was a common law right, extending to the English colonies generally, and especially to Massachusetts, the question is, whether any thing has been done by the colonial or provincial government, or by the government of the commonwealth, to impair or abridge that right.
Though the laws of the colony of Plymouth have been published within a few years, we believe that they contain no provision bearing on this subject. But the colony ordinance of 1641 is relied on, and, we believe, mainly relied on, as giv *354 ing to owners of land, bounding on tide waters, “ propriety,” or right to the soil, so far as the tide ebbs and flows, where it docs not ebb more than one hundred rods. The premises, in which the trespass in this case is assigned, lie in the town of Duxbury, within the limits of the old colony of Plymouth, and were not within the territorial jurisdiction of the colony of Massachusetts, when the ordinance in question was passed; and therefore that ordinance, as positive law, did not, proprio vigore, extend to this territory. But the great principle established by the colony ordinance, extending the right of soil of the upland owner to low water mark, has been held to extend by long usage to Maine; Storer v. Freeman, 6 Mass. 435; Codman v. Winslow, 10 Mass. 146; Lapish v. Bangor Bank, 8 Greenl. 85; to Plymouth,. Barker v. Bates, 13 Pick. 255; and to Martha’s Vineyard, Mayhew v. Norton, 17 Pick. 357; though all of these were under other territorial governments at the time the colony ordinance was passed. We have no doubt, therefore, that the plaintiff, as riparian owner, has the same proprietary interest in the soil, as if it were within the old territory of Massachusetts.
But although the riparian proprietor has an interest in the soil, it is not an absolute and unqualified ownership ; but so long as flats so situated are left open, unoccupied by any wharf, dock, or other inclosure, so long as the tide ebbs and flows over them, they so far retain their.original character and remain public. This double rule, to which the territory lying between high and low water mark may be subject, is not a novelty in the law, but an old and recognized principle. In Sir Henry Constable’s case, 5 Co. 107, it was held, that when the tide was up, the place, and acts done upon it, were within the jurisdiction of the admiralty; when bare, being within the body of the county, the common law had jurisdiction. It is quite certain, we think, that the mere fact, that the jus privatum, or right of soil, was vested in an individual owner, does not necessarily exclude the existence of a jus publicum, or right to the fishery in the public. The rule, established by usage and judicial decision, has been, that although the ordinance transfers the fee to the riparian owner, yet until it is so used, *355 built upon, or occupied, by the owner, as to exclude boats and vessels, the right of the public to use it is not taken away; but that whilst open to the natural ebb and flow of the tide, the public may use it, may sail over it, anchor upon it, fish upon it, and by so doing commit no trespass, and do not dis-seize the owner. Austin v. Carter, 1 Mass. 231.
This court are therefore of opinion, that where flats are left wholly open to the natural ebb and flow of the tide, unoccupied and uninclosed by the upland proprietor, the right of fishing on the part of the public is not excluded; and that the law, in this respect, makes no difference between shell-fish, and swimming or floating fish. See Parker v. Cutler Milldam Co. 7 Shepl. 357.
The only remaining question is, whether there is any other statute provision in force, which may take away or change the right, claimed by the defendants, to take clams in Duxbury. By Rev. Sts., c. 55, §§ 11,12, all persons are prohibited from taking oysters from their beds, unless by permits there specified, with an exception that every inhabitant may take oysters, without a permit, for the use of his family. The shell-fish taken in this case were not oysters, nor does it appear that‘they were not taken by the defendants for the use of their families. Section thirteen prohibits the taking of other shell-fish, but it is limited to certain towns, of which Duxbury is not one. It was a revision of former particular acts. All these also contain a proviso that they shall not prevent any fisherman from taking any quantity of shell-fish he may want for bait, not exceeding seven bushels at one time.
With these views of the law, the court are of opinion, upon the facts stated that the action cannot be maintained.

Plaintiffs nonsuit.