GEORGE I. ROCKWOOD, JR., & others[1] vs. THE SNOW INN
CORPORATION & another.[2]

Suffolk. October 3, 1990. - February 20, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Zoning*, Nonconforming use or structure, By-law. *Seashore. Real Prop-
erty*, Littoral property, Boundary.

The seaward boundary line of littoral property is determined by the mean
low water mark or the extreme low water mark that results from usual
causes and conditions, and is not the line reflecting the lowest level ever
reached by the sea at that location. [365-370]

Proposed changes and extensions to a preexisting nonconforming structure
did not comply with the lot coverage requirement of a town's zoning by-
law, in view of this court's conclusion that the seaward boundary of the
littoral property in question was the mean low water mark or the ex-
treme low water mark that results from usual causes and conditions,
rather than the line reflecting the lowest level ever reached by the sea
at that location, with the result that the board of appeals improperly
granted a special permit for the extensions. [370]

CIVIL ACTION commenced in the Land Court Department
on March 28, 1988.

The case was heard by *Marilyn M. Sullivan*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Stephen M. Voltz* for the plaintiffs.

*Robert D. Hall* for The Snow Inn Corporation.

*James M. Falla*, Town Counsel, for Board of Appeals of
Harwich.

*James M. Shannon*, Attorney General, & *Samuel D.
Zurier*, Assistant Attorney General, for the Commonwealth,
amicus curiae, submitted a brief.

---

[1] Bancroft R. Wheeler, Bruce Steere, and Susan Davis Brown.

[2] The board of appeals of Harwich.

*Richard S. Emmet*, for Conservation Law Foundation of New England, Inc., amicus curiae, submitted a brief.

O'CONNOR, J. The board of appeals of Harwich (board) granted The Snow Inn Corporation (Snow Inn) a special permit allowing changes and extensions to structures that preexisted the Harwich zoning by-law and did not fully conform to the by-law's setback requirements. The plaintiffs, neighbors of Snow Inn, appealed the board's decision to the Land Court. A judge of that court affirmed the board's decision, and the plaintiffs appealed. We granted the plaintiffs' application for direct appellate review and now reverse the judgment below.[3]

We set out the few facts that are essential to our decision. For many years a large complex has existed adjacent to Wychmere Harbor in the Harwichport section of Harwich. The major structures include Thompson's Clam Bar with a deck overlooking the harbor, a Victorian-era building known as The Snow Inn, and the Wychmere Harbor Club. The latter two buildings do not comply with the setback requirements of the Harwich zoning by-law. Those failures of compliance constitute nonconformities protected by G. L. c. 40A, § 6 (1988 ed.). Snow Inn's proposed project, for which it obtained board approval, would increase the square footage of the building coverage of the lot from 64,740 square feet to 85,865 square feet.

The zoning by-law requires that the buildings must not cover more than fifteen per cent of the Snow Inn lot. The lot is bounded on one side by the Atlantic Ocean (Nantucket Sound). If the lot is deemed to extend to the "extreme low water mark," as that term is used in modern tidal charts, that is, to reflect the lowest level ever reached by the sea at that location, the percentage of the lot that would be covered

---

[3]We acknowledge the submission of briefs by the Commonwealth and the Conservation Law Foundation of New England, Inc., as amici curiae.

by buildings after completion of the project would be less than fifteen per cent, thus complying with the lot coverage requirement of the by-law. However, if the lot is deemed to extend no further than either the "mean low water mark," that is, a line established by an average of the low tides, or "the line of extreme low water shown at an ebb of the tide, resulting from usual causes and conditions," *East Boston Co.* v. *Commonwealth*, 203 Mass. 68, 72 (1909), the percentage of lot coverage as a result of the proposed changes and extension would exceed fifteen per cent and thus would fail to comply with the by-law's lot coverage requirement.

General Laws c. 40A, § 6, provides in relevant part: "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures . . . lawfully in existence . . . before the first publication of notice of the public hearing [concerning the adoption of a proposed zoning ordinance or by-law] required by section five, but shall apply . . . to any reconstruction, extension or structural change of such structure . . . except where . . . reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure. Pre-existing nonconforming structures or uses may be extended . . . provided, that no such extension . . . shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such . . . extension . . . shall not be substantially more detrimental than the existing nonconforming use[4] to the neighborhood." We conclude,

---

[4]In *Willard* v. *Board of Appeals of Orleans*, 25 Mass. App. Ct. 15, 21 (1987), the Appeals Court construed the second quoted portion of c. 40A, § 6, as though it expressly said: "Pre-existing non-conforming structures or uses may be extended . . . provided, that no such extension . . . shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such . . . extension . . . shall not be substantially more detrimental than the existing nonconforming *structure or* use to the neighborhood" (emphasis in original). The Appeals Court supplied the words "structure or" "in order to render [G. L. c. 40A, § 6] intelligible and so effectuate its obvious intent." *Id.*

apparently differently from the trial judge, that the first sentence of the quoted portion of § 6 requires that, in the absence of a variance, any extension or structural change of a nonconforming structure must comply with the applicable zoning ordinance or by-law. Then, if the proposed extension or change conforms to the by-law, the second quoted statutory sentence requires for project approval a finding that the extension or change will not be substantially more detrimental to the neighborhood than the existing nonconforming structures. If the first and second sentences are read together, the statute permits extensions and changes to nonconforming structures if (1) the extensions or changes themselves comply with the ordinance or by-law, and (2) the structures as extended or changed are found to be not substantially more detrimental to the neighborhood than the preexisting nonconforming structure or structures.

If we were not to construe G. L. c. 40A, § 6, in that way, the provision in the first quoted sentence that a zoning ordinance or by-law "shall apply . . . to any reconstruction, extension or structural change of [a protected nonconforming structure]" would be meaningless surplusage. Indeed, even as to a single or two-family residence, structures to which the statute appears to give special protection, the zoning ordinance or by-law applies to a reconstruction, extension, or change that "would intensify the existing nonconformities or result in additional ones." *Willard* v. *Board of Appeals of Orleans*, 25 Mass. App. Ct. 15, 22 (1987).

Section X (J) of the Harwich zoning by-law tracks the second sentence quoted from G. L. c. 40A, § 6. Section X (J) provides: "Pre-existing non-conforming structures or uses may be changed, extended or altered on special permit from the Board of Appeals, provided that no such change, extension or alteration shall be permitted unless there is a finding by the Board that such change, extension or alteration shall not be substantially more detrimental to the neighborhood than the existing non-conforming use." Section X (J) is applicable under G. L. c. 40A, § 6, but, contrary to the trial judge's apparent understanding, we do not understand Sec-

tion X (J) to mean that the board's finding that the project will not be substantially more detrimental to the neighborhood than the existing nonconforming structure entitles the developer to make structural extensions or changes that would cause lot coverage or other by-law provisions to be violated.

Neither Snow Inn nor the board contends that a finding that the project will not be substantially more detrimental to the neighborhood than the existing nonconforming structure would itself justify extensions or changes that violate the by-law's lot coverage or other requirements. The board contends, however, that the only question before it, and hence before the Land Court judge and this court, was the "substantial detriment" question. The board maintains that the question whether Snow Inn's proposed project may violate lot coverage or other zoning requirements was not germane to the special permit hearing or the Land Court judgment and is better left to subsequent proceedings. The plaintiffs and Snow Inn do not appear to agree with that proposition. Rather, they vigorously argue several issues having to do with whether Snow Inn's proposed extensions and changes would violate the lot coverage and other by-law requirements. It may be that the plaintiffs could have waited until after the grant of the special permit was finalized before raising the question whether the buildings could be extended in such a way as to violate by-law restrictions. We need not decide that matter. In view of the parties' extensive arguments about whether the proposed project would conform to the by-law, and in light of the adjudication and order in the Land Court that "the improvements for which Snow Inn sought approval from the [board] met the statutory test forth in [G. L. c. 40A, § 6,] as well as that in the zoning by-law, [and] that they are protected by such provisions," we deem it appropriate for us to determine now whether the project as proposed would run afoul of the by-law.

We need to focus on only one question to resolve this case. That question is whether Snow Inn's property on its ocean side extends to a line that reflects the lowest level ever

reached by the sea, perhaps as the result of a severe storm or other unusual event at that location, or instead extends only to either the mean (average) low level mark or to a line determined by the extreme low water "at an ebb of the tide resulting from usual causes and conditions." *East Boston Co.* v. *Commonwealth,* 203 Mass. 68, 72 (1909). As we have said above, the answer to that question is determinative of this appeal, because it determines whether the project as proposed will meet the fifteen per cent building coverage by-law requirement.

The Colonial Ordinance of 1641-1647 declared that, "in all creeks, coves and other places, about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further." The Book of General Lawes and Libertyes 50 (1649). In *Storer* v. *Freeman,* 6 Mass. 435, 437 (1810), this court stated that, from the time the "ordinance was annulled with the charter by the authority of which it was made . . . a usage has prevailed, which now has force as our common law, that the owner of lands bounded on the sea or salt water shall hold to low water mark, so that he does not hold more than one hundred rods below high water mark; but the rights of others to convenient ways are saved, agreeably to a provision in the ordinance. This rule applies only in cases where the grantor, seised of the upland and flats, in conveying his land, bounds the land sold on the sea or salt water, or describes other boundaries of equivalent meaning, without any reservation of the flats. But the owner may sell his upland without the flats, or the flats, or any part thereof, without the upland."

In addition, the court said in *Storer, supra* at 438: "The sea-shore must be understood to be the margin of the sea, *in its usual and ordinary state.* Thus, when the tide is out, low water mark is the margin of the sea; and when the sea is full, the margin is high water mark. The sea-shore is therefore all the ground between the ordinary high water mark and low water mark." (Emphasis added.) The boundary line between

the sea and land subject to private ownership was established by the Colonial Ordinance of 1641-1647 and recognized by *Storer* as the ordinary low water mark. Although neither the ordinance nor *Storer* suggested a formula or specified the criteria for identifying the exact location of an ordinary low water mark, it is entirely clear that the court did not have in mind as the relevant low water mark a line reflecting the lowest level that the sea might ever have reached for any reason.

Thirty years after *Storer* v. *Freeman*, *supra*, was decided, this court decided *Sparhawk* v. *Bullard*, 1 Met. 95 (1840). In approving jury instructions the court stated: "The object of the ordinance of 1641, from which the right to flats originated, was to give the proprietors of land adjoining on the sea convenient wharf-privileges, to enjoy which, to the best advantage, it is often necessary to extend their wharves *to low-water mark at such times when the tides ebb the lowest*. 6 Mass. 438" (emphasis added). *Sparhawk*, *supra* at 108. The court's citation to "6 Mass. 438" was an obvious reference to *Storer* v. *Freeman*, *supra*. Although the opinion in *Sparhawk* may be susceptible of more than one interpretation, it appears that, by citing *Storer* with approval, the *Sparhawk* court intended to follow, not depart from, *Storer*, and thus to focus on a low water mark that could reasonably qualify as "ordinary." Nonetheless, in subsequent cases, this court, relying on the reference in *Sparhawk* to the "low-water mark at such times when the tides ebb the lowest," stated that the seaward boundary line of littoral property is the "extreme low water mark," without recognizing, at least expressly, that there is a difference between "ordinary extreme" and "extraordinary extreme" low water marks, and thus, it seems, giving rise to the critical issue in this case. For example, in *Sewall & Day Cordage Co.* v. *Boston Water Power Co.*, 147 Mass. 61, 64 (1888), the court said that the words "shall have propriety to the low-water mark," as used in the Colonial Ordinance, did not refer to "ordinary low-water mark," but rather to "extreme low-water mark," thus remotely suggesting, perhaps, that the significant low water

mark is the line for which Snow Inn contends in this case. Again, citing *Sewall & Day Cordage Co.*, *supra*, and other cases, the court in *Iris* v. *Hingham*, 303 Mass. 401, 403 (1939), stated that "[t]he petitioner owned the fee to the flats adjacent to her land and her ownership, by virtue of the colony [*sic*] ordinance of 1641-1647, extended to extreme low water or to one hundred rods from the ordinary high water mark, if the low water mark lies beyond that distance." Neither *Sewall & Day Cordage Co.*, *supra*, nor *Iris* v. *Hingham*, *supra*, nor any of the cases cited therein, explained how the location of the extreme low water mark was to be determined nor precisely what that term meant. It is especially important to note that in no case, including *Sewall & Day Cordage Co.*, *supra*, has this court ever clearly and expressly held or even stated in dictum that the boundary between the sea and ownable flats is determined by the lowest level ever reached by the sea at the relevant location.

We think that the confusion engendered by the arguable departure of the *Sparhawk*, *Sewall & Day Cordage Co.*, and *Iris* line of cases from the text of the Colonial Ordinance of 1641-1647 and *Storer* v. *Freeman*, *supra*, may be substantially alleviated by resort to the reasoning in *East Boston Co.* v. *Commonwealth*, 203 Mass. 68, 72 (1909). In that case, for the first time, the court came to grips with the manner in which one determines where an "'ordinary' low water mark," or "extreme low water mark" may be located. That case involved an order emanating from a session of the General Court on March 13, 1640, before the Colonial Ordinance was effective, which order "declared[ ] that the flats round about Nodles Iland [now East Boston] do belong to Nodles Iland to the ordinary lowe water marke." *Id.* at 69. A principal question was whether the 1640 order granted the flats "to extreme low water mark, or extended only to a line corresponding to the present line of mean low water, or to some other line of low water." *Id.* at 70. The court stated that the words of the 1640 order "suggest at once a distinction between the line indicated and absolute low water mark, or extreme low water mark. The language is 'ordinary' low

water mark, which seems to imply that there is some recognized line to which the tide usually ebbs. But the evidence shows that this is not the fact. The line of low water, like the line of high water, is gradually and constantly changing from day to day in different parts of the month, and in different parts of the year, from the highest spring tides to the lowest neap tides. If the distinction intended is between the extreme low water mark and the ordinary or common line of low water, having reference to all times and all seasons, the only way of reaching a correct result is to take the average of the low tides, which gives us the line of mean low water. The use of the word 'ordinary' distinguishes this grant from the Colonial Ordinance of 1647, which extends the line of individual ownership as far as the tide ebbs, if that point is not more than one hundred rods from ordinary high water mark. For reasons stated in the decisions, this means the line of extreme low water shown at an ebb of the tide, *resulting from usual causes and conditions*" (emphasis added). *Id.* at 72. Thus, not only is there no case in our jurisprudence in which this court has clearly held or said that the line of individual ownership is at the lowest level the sea has ever reached at that location, but, in *East Boston Co.* v. *Commonwealth, supra,* the court, construing the Colonial Ordinance of 1641-1647 as referring to the "extreme low water mark," considered the reference to be the extreme low water at an ebb of the tide "resulting from usual causes and conditions."

Since our decision in *Iris* v. *Hingham, supra,* in 1939, there have been no decisions of this court focusing on the issue discussed above. However, the Justices have spoken twice in advisory opinions. In *Opinion of the Justices,* 365 Mass. 681, 685 (1974), the Justices interpreted *Storer* v. *Freeman, supra,* as holding that the Colonial Ordinance of 1641-1647 "extend[ed] private titles to encompass land as far as mean low water line or 100 rods from the mean high water line, whichever was the lesser measure." The same implication may be found in *Opinions of the Justices,* 383 Mass. 895, 901-903 (1981). To the same effect, see *Newburyport Redevelopment Auth.* v. *Commonwealth,* 9 Mass.

App. Ct. 206, 238 n.21 (1980), and *Beckett* v. *Building In-spector of Marblehead*, 6 Mass. App. Ct. 96, 101 (1978). We conclude that Snow Inn's property does not extend to the "extreme low water line" as that term is used in modern tidal charts to reflect the lowest level ever reached by the sea at that location, and we overrule any of our prior cases to the extent, if any, that they may imply that our law is otherwise. Therefore, we are satisfied that the proposed project would violate the Harwich zoning by-law's lot coverage requirement and that the judgment entered in the Land Court must be reversed.

Resolution of this appeal does not require us to decide whether the proper measure of the low water mark to which littoral property may extend is the mean low water mark or, instead, is the extreme low water mark that results from usual causes and conditions. According to the evidence in this case, the difference between the mean low water mark and the mark established by an ebb of the tide resulting from usual causes and conditions is only .07 of a foot (approximately 1/16 of an inch) in elevation, and therefore the buildings as proposed by Snow Inn would cover more than fifteen per cent of the lot regardless of whether private ownership extends to the extreme low water mark under usual and ordinary conditions or to the mean low water mark. Accordingly, we need not and do not decide whether the proper measure of the low water mark to which littoral property may extend is the mean low water mark or, instead, is the extreme low water mark that results from usual causes and conditions.

*Judgment reversed.*