## THOMAS BRANSFORD & others[1] *vs.* ZONING BOARD OF APPEALS OF EDGARTOWN.

Suffolk. April 4, 2005. - August 12, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Zoning,* By-law, Lot size, Nonconforming use or structure, Special permit, Appeal. *Statute,* Construction.

This court affirmed a judgment of the Land Court requiring landowners to seek a special permit for the reconstruction of their single-family residence on a nonconforming lot and affirming the denial, by the defendant town's zoning board of appeals, of the plaintiffs' application for the special permit. [852-853]

GREANEY, J., with whom MARSHALL, C.J., and SPINA, J., joined, was of the view that the plaintiffs' reconstruction of their single-family residence, which doubled the size of the structure on an undersized and nonconforming lot, intensified existing nonconformities within the meaning of G. L. c. 40A, § 6, first par., thereby requiring the plaintiffs to seek a special permit, the denial of which was within the discretion of the local zoning board of appeals [853-863].

CORDY, J., with whom IRELAND, J., and SOSMAN, J., joined, dissented on the ground that the language of G. L. c. 40A, § 6, first par., the legislative policy underlying the clause, and its practical implications would allow a homeowner, as a matter of right, to reconstruct a residence on a nonconforming and undersized lot, where the resulting structure would be in conformity with all dimensional requirements in the local zoning bylaw other than lot size. [863-870]

CIVIL ACTIONS commenced in the Land Court Department on June 13, 2001, and February 6, 2002, respectively.

After consolidation, the case was heard by *Alexander H. Sands,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Daniel C. Perry* for the plaintiffs.

*Ronald H. Rappaport* for the defendant.

BY THE COURT. On June 27, 2005, this court affirmed the

---

[1]Patricia Bransford and Kathryn Bransford.

judgment of the Land Court in these consolidated cases by an equally divided court. Justice Cowin took no part in the decision. Separate opinions of Justice Greaney, with whom Chief Justice Marshall and Justice Spina join, and Justice Cordy, with whom Justices Ireland and Sosman join, appear below.

GREANEY, J. (concurring, with whom Marshall, C.J., and Spina, J., join). The plaintiffs' application for direct appellate review was granted to decide whether "reconstruction" of their single-family residence, which satisfies all dimensional requirements in the town's zoning bylaw except required minimum lot area, "increase[s] the nonconforming nature of [the] structure" within the meaning of the language in that clause in G. L. c. 40A, § 6, first par. A Land Court judge concluded that, under the clause, "doubling the size of the structure on an undersized (nonconforming) lot [would] increase the nonconforming nature of the structure," thereby requiring the plaintiffs to seek a special permit. The judge also affirmed the denial, by the defendant town's zoning board of appeals (board), of the plaintiffs' application for the special permit. On this point, the judge concluded that the plaintiffs had failed to rebut the board's "determination that the increase in footprint and square footage of [their] proposed new structure is a substantial detriment to the neighborhood, or that [the] determination [was] arbitrary and capricious." I agree that the judgment should be affirmed.

The undisputed facts are as follows. In 1989, members of the Bransford family, including the plaintiff Thomas Bransford, acquired title to property located in the Katama area of Edgartown on the island of Martha's Vineyard. The property is approximately 22,125 square feet in area (about one-half acre), has approximately 125 feet of frontage on Mattakesett Way, and contained, at that time, a three-bedroom, two-story, single family residence with approximately 1,250 square feet of living area with decks on both floors and a roof deck. The property is located in the R-60 residential district.

The property was created by a subdivision plan recorded in 1973. In April, 1973, the zoning bylaw was amended to require,

in the R-60 residential district, a minimum lot area[1] of one and one-half acres (65,340 square feet). A dispute exists as to when the three-bedroom, two-story residence was built on the property. The parties agree, however, that the minimum lot area of 21,780 square feet applied when the residence was constructed and, at that time, the residence conformed to zoning bylaws.

The plaintiffs twice sought a building permit to construct a new, larger single-family residence on the property that would comply with all dimensional requirements of the zoning bylaw with the exception of the minimum lot area of 65,340 square feet. The proposed new residence differed from the original by having a significantly greater interior living area (approximately 2,300 square feet[2]), and a greater footprint[3] (by 200 square feet). Additionally, the proposed new residence's height would exceed that of the former residence. In support of their applications, the plaintiffs relied on § 11.9(b) of the zoning bylaw.[4] The building inspector refused to issue a building permit without prior authorization from the board. After denial of one of the applications for a building permit, the plaintiffs had the original

---

[1]The zoning bylaw defines "Lot Area" as follows: "The horizontal area of the lot exclusive of any area in a street or recorded way. Land under any water body, bog, swamp, wet meadow, marsh, wetland, coastal beach or coastal dune . . . shall not be included in the 'lot area' required for zoning compliance."

[2]The record also reflects an interior space of 2,600 square feet. The difference is immaterial.

[3]The zoning bylaw does not regulate the "footprint" of a structure or contain a "ground coverage ratio" provision. The term "footprint," while subject to various definitions, see, e.g., Rogers v. Norfolk, 432 Mass. 374, 376 n.6 (2000), is used here in general terms to describe the amount of land area occupied by the house. Similarly, the term "ground coverage ratio" describes the ratio of building area to lot area on a parcel. See Planning Bd. of Nantucket v. Board of Appeals of Nantucket, 15 Mass. App. Ct. 733, 734 (1983).

[4]Section 11.9(b) of the zoning bylaw provides:

"Where alteration, reconstruction, extension or structural change to a single family or two family residential structure does not increase the non-conforming nature, neither public hearing nor Special Permit from the Board of Appeals is required for said alteration, reconstruction, extension or structural change, provided it conforms to all statutory and By-Law requirements in effect when the work was done."

residence on the property removed (with the exception of its foundation) to another site.

The plaintiffs next filed a request for determination under G. L. c. 40A, § 6, first par., with the board, asserting that they were legally entitled to construct their proposed new residence under the second "except" clause of § 6, first par. After obtaining an opinion from town counsel, the board voted unanimously to allow reconstruction of a single-family residence on the property, but decided that, without a special permit, the residence could not exceed the footprint and square footage of the original residence.

The plaintiffs then filed an application with the board for a special permit seeking a determination pursuant to the second sentence of G. L. c. 40A, § 6, first par., and § 11.9(f)[5] of the zoning bylaw, that their proposed new residence was not "substantially more detrimental to the character of the neighborhood" than the original residence. After a hearing, the application was denied, and the plaintiffs appealed from both decisions of the board to the Land Court where a judge denied the plaintiffs' motion for summary judgment and granted summary judgment to the board. This appeal followed.

1. The plaintiffs argue that they are entitled to construct their proposed new residence[6] because, under the second "except" clause of G. L. c. 40A, § 6, first par., the "reconstruction" will not "increase the nonconforming nature of [the] structure," but

---

[5]Section 11.9(f) of the zoning bylaw provides in part:

> "The Special Permit Granting Authority shall have the authority to grant a special permit for the change, extension or alteration of a preexisting, nonconforming structure . . . where such change, extension, alteration, or construction will not comply with the applicable provisions of the zoning bylaw; provided, however, that the Special Permit Granting Authority finds after a public hearing that other lots in the neighborhood have been previously developed by the construction of buildings or structures in such a manner as to have resulted in similar nonconformities, and that the proposed expansion, extension, alteration, or construction will not be more objectionable or substantially more detrimental to the character of the neighborhood than the original structure."

[6]The board does not argue that the plaintiffs' proposed new residence is not a "reconstruction" under G. L. c. 40A, § 6, first par.

will only result in the presence of a conforming structure on a nonconforming lot.[7] The issue is one of law, requiring no deference to the board. See *Fitchburg Hous. Auth.* v. *Board of Zoning Appeals of Fitchburg*, 380 Mass. 869, 871 (1980); *Needham Pastoral Counseling Ctr., Inc.* v. *Board of Appeals of Needham*, 29 Mass. App. Ct. 31, 32 (1990).

The relevant provisions (with the second "except" clause highlighted) are the first two sentences of G. L. c. 40A, § 6, first par.:

> "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent *except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure.* Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall

---

[7]The plaintiffs correctly do not argue that they are entitled to reconstruct their proposed new residence pursuant to G. L. c. 40A, § 6, fourth par. (first sentence). That provision applies only to a lot not held in common ownership as reflected in the most recent instrument of record before the effective date of the zoning change, see *Adamowicz* v. *Ipswich*, 395 Mass. 757, 762 (1985), and to a lot comprised of vacant land (a lot on which construction has not begun), see *Dial Away Co.* v. *Zoning Bd. of Appeals of Auburn*, 41 Mass. App. Ct. 165, 168 (1996). There is no dispute that the residence that the plaintiffs removed from the property existed when they (and even their immediate predecessors) purchased the property. Further, any "freeze" period that may have been applicable under G. L. c. 40A, § 6, fifth par., affording protection to certain lots formed in connection with a subdivision plan that were left undeveloped, has long expired. See M. Bobrowski, Massachusetts Land Use and Planning Law § 5.04 (2d ed. 2002).

be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming [structure or] use to the neighborhood." (Emphasis added.)

The words "structure or" appearing in the brackets in the second sentence quoted above were supplied by *Willard* v. *Board of Appeals of Orleans*, 25 Mass. App. Ct. 15, 21 (1987), and later noted and applied in *Rockwood* v. *Snow Inn Corp.*, 409 Mass. 361, 363 n.4, 364 (1991).

While the issue here is novel, the Appeals Court has had considerable occasion to interpret the statute's "difficult and infelicitous" language. *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. 53, 55 (1985). In the *Fitzsimonds* case, the Appeals Court examined § 6, first par., and concluded that a "reconstruction" of a nonconforming single-family residential structure "is legitimated under the second 'except' clause of the first sentence if it 'does not increase the nonconforming nature of said structure'; otherwise (as occurs in certain events in regard to changes of other structures referred to in the language preceding the 'except' clause), it must be submitted to the special permit procedure of the second sentence for a determination by the board of the question whether it is 'substantially more detrimental than the existing nonconforming use to the neighborhood.' " *Id.* at 56. By itself, this interpretation seems unremarkable because that is what the second "except" clause seems to say. But, the interpretation is necessarily helpful for pulling out of the convoluted language of the statute some meaning permitting analysis of when landowners may go ahead as of right to reconstruct a dwelling and when they must seek prior approval from the permit granting authority. Left, however, was the measure by which a zoning authority or court could determine whether the reconstruction did or did not increase "the nonconforming nature of [the] structure."

In the *Willard* case, *supra* at 18, the Appeals Court more closely examined the second "except" clause and undertook to solve the latter problem. The court first noted that the clause

had "no identifiable ancestor in G. L. c. 40A, as in effect prior to St. 1975, c. 808, § 3," and "made its first appearance, without accompanying explanation . . . in 1974 House Doc. No. 5864." See M. Bobrowski, Massachusetts Land Use and Planning Law § 6.06 (2d ed. 2002). The Appeals Court then went on to state an operational measure for resolution of cases like this one by providing the following:

> "[T]he second 'except' clause of the first paragraph of c. 40A, § 6, requires . . . [8] an initial determination whether a proposed alteration of or addition to [or reconstruction of] a nonconforming structure would 'increase the nonconforming nature of said structure' . . . .This part of the statute is not concerned with the use of the structure or of the land on which it is located. We think the quoted language should be read as requiring a board of appeals[9] to identify the particular respect or respects in which the existing structure does not conform to the requirements of the present by-law and then determine whether the proposed alteration or addition would intensify the existing nonconformities or result in additional ones. If the answer to that question is in the negative, the applicant will be entitled to the issuance of a special permit under the second 'except' clause of G. L. c. 40A, § 6, and any implementing by-law. Only if the answer to that question is in the affirmative will there be any occasion for consideration of the additional question illuminated in the *Fitzsimonds* case [of detriment to the neighborhood]."

*Willard* v. *Board of Appeals of Orleans, supra* at 21-22.

Subsequent Appeals Court decisions have followed the *Fitzsimonds-Willard* framework. See *Dial Away Co.* v. *Zoning Bd. of Appeals of Auburn,* 41 Mass. App. Ct. 165, 170-171 (1996); *Goldhirsh* v. *McNear,* 32 Mass. App. Ct. 455, 460 (1992). Other decisions of the Appeals Court have (on different facts) also indicated that consideration of a structure's footprint

---

[8] I omit the language providing that a board of appeals makes the initial determination, agreeing with one respected commentator, that this initial determination more appropriately should be conducted by the building inspector or zoning administrator. See M. Bobrowski, Massachusetts Land Use and Planning Law, *supra* at § 6.06.

[9] See note 8, *supra.*

is a factor to consider in determining intensification. See *Gold-hirsh* v. *McNear, supra* at 461; *Willard* v. *Board of Appeals of Orleans, supra* at 22; *Fitzsimonds* v. *Board of Appeals of Chatham, supra* at 57. In *Goldhirsh* v. *McNear, supra,* the Appeals Court rejected the notion that "there will never be an increase in a structure's nonconforming nature where the proposed alterations are confined to the existing footprint." Several Land Court decisions brought to our attention in the briefs (which in keeping with usual practice we do not cite) have applied the framework, and have concluded that reconstruction is not permissible of right where an otherwise conforming structure lies on a nonconforming (undersized) lot. The rule to date, therefore, is simple: where an undersized lot exists, the proposed reconstruction may be allowed without special permit only if the proposed new residence does not intensify existing nonconformities.

I agree with this body of decisional law and would adopt the rule[10] because it leads to a sensible result and advances legislative purposes with respect to zoning. See *Adamowicz* v. *Ipswich,* 395 Mass. 757, 760 (1985). I have in mind here that (1) pursuant to a "unanimity of [authoritative] opinion," "the ultimate objectives of zoning would be furthered by the eventual elimination of nonconformities in most cases," and (2) the nonconformities contemplated in G. L. c. 40A, § 6, first par., include situations like this one where a conforming structure exists on a nonconforming lot. Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, 1972 House Doc. No. 5009 at 32, 39. See *Strazzulla* v. *Building Inspector of Wellesley,* 357 Mass. 694, 697 (1970), cert. denied, 400 U.S. 1004 (1971) (considering "eventual elimination of nonconforming uses as an objective underlying zoning regulations"); 4A N. Williams, Jr., American Land Planning Law 283-289 (1986) (noting that term "nonconforming use" is sometimes used generically to cover all nonconformities). While the dissenting opinion points to the freeze contained in the

---

[10]A different conclusion is not compelled by § 11.9(b) of the zoning bylaw. See note 4, *supra.* Not only does that provision fail to qualify the words "non-conforming nature," but it also requires that the reconstruction conform to all bylaw requirements *when the work was done.* Thus, the provision requires compliance with the minimum lot area requirement.

first sentence of G. L. c. 40A, § 6, fourth par. (pertaining to vacant lots held in separate ownership, see note 7, *supra*) as evidencing a legislative intent to permit the nonconformity here, that freeze demonstrates a legislative intent to minimize substandard lots. See *Giovannucci* v. *Board of Appeals of Plainville*, 4 Mass. App. Ct. 239, 242 (1976), citing 8 E. McQuillin, Municipal Corporations § 25.71, at 189 (3d ed. 1965). Had the Legislature wanted to afford greater protection to substandard lots such as the one at issue in this case, it could have expressly done so. Further, the rule would not, as the plaintiffs contend, eliminate existing residences on undersized lots. If their proposed new residence had retained the size of the original, no intensification would be present and reconstruction would have been permissible. The rule does not, as a practical matter, make it more costly and difficult to modernize older homes.

The rule also takes into account that a minimum lot area requirement represents a proper exercise of police power, see *Simon* v. *Needham*, 311 Mass. 560, 562 (1942); P. Rohan, Zoning and Land Use Controls § 42.04[1] (2004), that serves many useful purposes. In *Simon* v. *Needham*, *supra* at 563, for example, the court explained:

> "The establishment of a neighborhood of homes in such a way as to avoid congestion in the streets, to secure safety from fire and other dangers, to prevent overcrowding of land, to obtain adequate light, air and sunshine, and to enable it to be furnished with transportation, water, light, sewer and other public necessities, which when established would tend to improve and beautify the town and would harmonize with the natural characteristics of the locality, could be materially facilitated by a regulation that prescribed a reasonable minimum area for house lots."

See P. Rohan, Zoning and Land Use Controls, *supra* (explaining minimum lot area requirements achieve population and building density controls); E.C. Yokley, Zoning Law and Practice § 23-9, at 23-40 (2003) (among purposes of minimum lot area requirements "are maintaining the character of low density residential neighborhoods, protecting environmentally sensitive areas, and preservation of open space"). In amending a prior

zoning enabling act, the Legislature suggested that objectives of zoning regulations may include the following:

> "[T]o lessen congestion in the streets; to conserve health; to secure safety from fire, flood, panic and other dangers; to provide adequate light and air; to prevent overcrowding of land, to avoid undue concentration of population; to encourage housing for persons of all income levels; [and] to facilitate the adequate provision of transportation, water, water supply, drainage, sewerage, schools, parks, open space and other public requirements; to conserve the value of land and buildings, including the conservation of natural resources and the prevention of blight and pollution of the environment."

St. 1975, c. 808, § 2A. In furtherance of these legislative goals, the Legislature specifically endorsed the adoption of regulations pertaining to "areas and dimensions of land . . . to be occupied or unoccupied by uses and structures, courts, yards and open spaces." *Id.* Also, as noted in *Johnson* v. *Edgartown*, 425 Mass. 117, 124 (1997), "[T]here are regional and Statewide interests in the preservation of the unique quality of Martha's Vineyard. Those interests justify the making of conservative assumptions about the consequences of land uses . . . ." These considerations, in one fashion or another, support the need for local review of proposed reconstruction of nonconforming uses, structures, and lots, to promote conformity and to prevent land use anomalies.

The plaintiffs' argument, that no problem exists because their nonconforming lot will remain exactly the same with the reconstructed residence, fails to appreciate the goals set forth above. The expansion of the residence's footprint, and the expansion in living area, will, at the very least, tend to reduce the open space previously existing on the lot and to increase the density of the residential neighborhood. Creating a distinction in treatment between a nonconforming structure and a nonconforming lot is one that analytically and practically should not be made. The two concepts are intertwined and separating them would permit a landowner to circumvent valid and useful minimum lot area requirements.

A different view of the case leads to the same result. If one

accepted the plaintiffs' position that the second "except" clause of § 6, first par., speaks only to the nonconformities of "structures," then the entire first paragraph of § 6, read as a whole (and in that context), could be interpreted to apply only to nonconforming structures and uses. As so limited, the statute is not applicable to the plaintiffs (because there is no nonconforming structure or use on the property) and affords them no exemption. The inquiry then becomes whether a zoning bylaw provision prohibits their planned reconstruction. Under § 17.1 of the zoning bylaw, "no structure or part thereof may be erected . . . except in conformance with this By-Law." Once the plaintiffs removed the original structure from the nonconforming lot, they were left with the nonconforming lot. Under the bylaw, to erect a structure in the R-60 residential district, they need, but do not have, a lot with one and one-half acres. Because the town's zoning bylaw addresses the problem by prohibiting the erection of structures in a R-60 residential district on lots of less than one and one-half acres, once the plaintiffs removed the original residence, they had no entitlement to a building permit to build a new residence.

2. The board's denial of the plaintiffs' special permit to reconstruct their proposed new residence was within its discretion. The affidavit of the board's chairman demonstrates that the board's denial, based on its conclusion that the plaintiffs' proposed residence on the undersized lot would be substantially more detrimental to the neighborhood, see G. L. c. 40A, § 6, first par. (second sentence), was not "based on a legally untenable ground, or unreasonable, whimsical, capricious or arbitrary." *Britton* v. *Zoning Bd. of Appeals of Gloucester*, 59 Mass. App. Ct. 68, 72 (2003), quoting *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 639 (1970). See *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 356 (2001) (stating that "[e]ven when a zoning board cites no particularized reasons or any specific evidence for its denial decision, its action will be upheld, as will that of a judge affirming that action under G. L. c. 40A, § 17, if a rational basis for the denial exists which is supported by the record"). The affidavit noted the expansion of the proposed new residence in terms of footprint, living area, and height; that the average structures in the vicinity of the plaintiffs' lot measured

approximately 1,800 square feet in area (significantly smaller than the area of the plaintiffs' proposed new structure); and that the area on which the plaintiffs' lot is located is flat, open terrain, with few trees or vegetation to buffer homes from each other. Inasmuch as the proper inquiry concerns the effect of "reconstruction" on "the neighborhood," the plaintiffs' reliance on statistics concerning the "national average" of living area and lot sizes of "new" homes is immaterial.

CORDY, J. (dissenting, with whom Ireland and Sosman, JJ., join). This case presents a question of statutory interpretation: does G. L. c. 40A, § 6, first par., permit a homeowner, as a matter of right, to reconstruct or renovate his residence on a nonconforming (undersized) lot, in a manner that increases its living space, height, or footprint, where the improved structure would be in conformity with all dimensional requirements in the town's zoning bylaw other than lot size? In other words, does such a reconstruction "increase the nonconforming nature" of the residence, thereby removing it from the special protections afforded single and two-family residential structures under the grandfathering or so-called second "except" clause of G. L. c. 40A, § 6, and requiring the homeowner to obtain a special permit to proceed?[1] The answer to the question has important consequences for residents of established neighbor-

---

[1]Structures without this protection fall within the following provision of G. L. c. 40A, § 6, first par. (second sentence): "Pre-existing nonconforming structures or uses may be extended or altered, provided, that no such extension or alteration shall be permitted unless there is a finding by the permit granting authority or by the special permit granting authority designated by ordinance or by-law that such change, extension or alteration shall not be substantially more detrimental than the existing nonconforming use to the neighborhood." Although the statute speaks only to a "finding" by either the permit granting authority or the special permit granting authority, cities and towns may enact local legislation to provide for a special permit process, with the requirement that a supermajority of the permit granting authority approve, to generate such a "finding." *Shrewsbury Edgemere Assocs. Ltd. Partnership* v. *Board of Appeals of Shrewsbury,* 409 Mass. 317, 324 (1991).

As I would reverse the judgment of the Land Court on the ground that the second "except" clause of G. L. c. 40A, § 6, first par. (first sentence), is applicable to the plaintiffs' proposal to reconstruct a home on their property, I would not reach the question whether there was a rational basis for the board's denial of the special permit on the ground that the reconstruction would be

hoods across the Commonwealth with single- or two-family homes built on modest-sized lots (as permitted at the time of their construction) that have become nonconforming as a result of zoning changes that have increased the minimum lot sizes for residential development in those neighborhoods. The answer of the concurrence would seem to require a special permit for any improvement that increases the living space of a grandfathered residence. Because it is my view that this answer accords far too little weight to the language of the statute, the legislative policy underlying the relevant clause, and its practical implications, I respectfully dissent.

The zoning act, embodied in G. L. c. 40A, was substantially revised in 1975, St. 1975, c. 808, in the wake of the 1966 passage of art. 89 of the Amendments to the Massachusetts Constitution (home rule amendment). Prior to its passage, the zoning power belonged exclusively to the State, and could be exercised by municipalities only to the extent that State law permitted them to do so. *Durand* v. *IDC Bellingham, LLC*, 440 Mass. 45, 50 (2003), citing *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 356-357 (1973). Through passage of the amendment, municipalities gained constitutional authority to exercise the police powers of the State, including the power to enact zoning ordinances, except in contravention of State law or other provisions of the Constitution. *Durand* v. *IDC Bellingham, LLC, supra* at 50, citing *Board of Appeals of Hanover* v. *Housing Appeals Comm., supra* at 358, 359.

Included in the zoning act of 1975, therefore, are a number of important statutory limitations on municipal power and protections for property owners, only one category of which concerns us here: the extensive protection afforded owners of single or two-family homes constructed and situated in accord with local ordinances or bylaws (zoning ordinances) in effect at the time the homes were built. Later enacted zoning ordinances have no effect on the continued use and occupancy of these residences. G. L. c. 40A, § 6, first par. (first sentence) ("a zoning ordinance or by-law shall not apply to structures or uses lawfully in exist-

---

"substantially more detrimental . . . to the neighborhood." G. L. c. 40A, § 6, first par. (second sentence).

ence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law"). While these homes may be deemed "nonconforming" (because they no longer conform in some respect to current local zoning requirements), they are not "illegal." Indeed, local zoning ordinances do not even apply to the "alteration, reconstruction, *extension* or structural change" of such homes so long as those improvements do "not increase the[ir] nonconforming nature" (emphasis added). G. L. c. 40A, § 6, first par. (first sentence). This latter protection is unique to single- and two-family homes. See *Rockwood* v. *Snow Inn Corp.*, 409 Mass. 361, 364 (1991).[2]

[2]If zoning ordinances do not apply to the "alteration, reconstruction, extension or structural change" of these homes, no special permit ought to be necessary to proceed with such improvements. Insofar as an improvement requires a building permit, the building inspector must determine in the first instance whether the home is nonconforming and, if so, whether the proposed improvement would "increase" the "nature" of the nonconformity, such that the improvement would require the homeowner to obtain a finding or special permit from the local permit granting authority. See note 1, *supra.* Such determinations should be based on objective rather than subjective criteria in order to ensure that the rights protected in the State statute are not undermined in the municipalities where they were intended to apply. Decisions of the Appeals Court that adopt a contrary "framework," *ante* at 858, relying on subjective assessments by local boards and, in effect, requiring the homeowner to secure some form of special permit for any improvement to a nonconforming structure are, in my view, inconsistent with the plain wording and purpose of the statute. See M. Bobrowski, Massachusetts Land Use and Planning Law § 6.06, at 200 (2d ed. 2002) (Bobrowski).

The Appeals Court has held that the proper arbiters of what constitutes an "increase [in] the nonconforming nature of [a] structure" are zoning boards of appeal, which should make the determination with some measure of localized judgment. See *Goldhirsh* v. *McNear*, 32 Mass. App. Ct. 455, 461 (1992) ("Whether the addition of a second level to the carriage house will intensify the nonconformity is a matter which must be determined by the board in the first instance. The fact that there will be no enlargement of the foundational footprint is but one factor to be considered in making the necessary determination or findings"); *Willard* v. *Board of Appeals of Orleans*, 25 Mass. App. Ct. 15, 21-22 (1987) ("We think [the clause] should be read as requiring a board of appeals to identify the particular respect or respects in which the existing structure does not conform to the requirements of the present by-law and then determine whether the proposed alteration or addition would intensify the existing nonconformities or result in additional ones. If the answer to that question is in the negative, the applicant will be entitled to the issuance of a special permit under the second 'except' clause . . . . Only if the answer to

We have previously held that the nonconforming nature of a structure is increased if it is "intensif[ied]" by the improvement or if the improvement creates an additional nonconformity. *Id.* In the present case, we deal only with the former circumstance. As to the latter, the town has a number of dimensional requirements for the construction of homes on lots (such as height and setbacks), and could indeed have (but has not) promulgated others such as "reasonable regulations concerning *the bulk . . . of structures* and determining . . . open space, parking and *building coverage* requirements" (emphasis added). G. L. c. 40A, § 3, second par. These regulations affect the over-all size and configuration of homes in relationship to the size and configuration of their lots, and the density of development permitted in the neighborhood. It is undisputed that the reconstructed building would conform to these requirements.

So the issue we must decide is whether the increase in the size or footprint of a single- or two-family home, as a matter of law, intensifies the nature of its nonconformity when its only nonconformity is, and will continue to be, the size of its lot. I conclude that it does not. The nature of its nonconformity can be fairly described as a "[c]onforming structure on [a] nonconforming lot," as compared to a nonconforming structure on a conforming lot, a nonconforming structure on a nonconforming lot, or various other "nonconforming uses" of build-

that question is in the affirmative will there be any occasion for consideration of the additional question [of detriment to the neighborhood]").

The concurrence correctly but quietly rejects some of the Appeals Court's flawed reading of the statute, by stating that the building inspector should make the initial determination of whether a proposed reconstruction increases the nonconforming nature of a structure. *Ante* at 858 n.8. See Bobrowski, *supra* at § 6.06, at 200 (Appeals Court "has jumped the gun in assigning this initial determination to the board of appeals. The first official to review an application to extend a nonconforming residential structure will be the building inspector or zoning administrator, and her review will be under the auspices of a building permit application, not an application for a special permit or finding"). Yet the concurrence fails to acknowledge the error in the rest of the "framework" that, in essence, requires the homeowner to establish the existence of the grandfathered right through a process akin to the special permit process from which the Legislature intended to exempt the owners of single-family and two-family residences through the second "except" clause. See *id.* ("*Willard* test should be read as prescribing an entitlement to a building permit, not a special permit or finding, where no intensification of the nonconformity would result").

ings or land. Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, 1972 House Doc. No. 5009 at 35 (DCA report).[3] The zoning ordinance to which the lot fails to conform has nothing to do with the size or placement of the structure on it. A 2,400 square foot structure on an undersized lot is equally as nonconforming as a 1,200 square foot structure on the same size lot. It is lot size, not building size, that is at issue. The nature of the proposed home's nonconformity will remain unchanged and unaffected by the proposed improvements. The home will be neither less nor more nonconforming.[4]

This conclusion is consistent with the approach taken by the Legislature, in the same section of G. L. c. 40A, toward the application of zoning changes that increase minimum lot size (or "frontage, width, yard, or depth requirements") on lots for "single and two-family residential use" that were recorded as such but not yet built upon when the zoning changes took effect.

---

[3]Following the passage of art. 89 of the Amendments to the Massachusetts Constitution (home rule amendment), the Legislature requested that the predecessor agency to the Department of Community Affairs (DCA) conduct an investigation and propose a redrafting of the zoning enabling act. Res. 1967, c. 141. In 1972, the DCA issued a comprehensive report offering criticisms of the zoning statute and a proposed "comprehensive revision" of G. L. c. 40A. Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, 1972 House Doc. No. 5009 at 7 (DCA report). The report is the "chief document in the legislative history of the Zoning Act." Bobrowski, *supra* at § 2.03, at 38.

[4]The concurrence asserts that allowing the reconstruction without a special permit "would permit a landowner to circumvent valid and useful minimum lot area requirements." *Ante* at 861. The concurrence also suggests that the new structure will increase the density of the neighborhood and reduce the open space previously existing on the lot, contrary to the broadly shared interest "in the preservation of the unique quality of Martha's Vineyard." *Id.*, quoting *Johnson* v. *Edgartown*, 425 Mass. 117, 124 (1997). While minimum lot area requirements are indeed "valid and useful" in the way the concurrence details, it is unclear how the plaintiffs' proposal seeks to "circumvent" those requirements. I do not question the legitimacy of minimum lot requirements as a means of preserving open space or of limiting the density of residential neighborhoods on Martha's Vineyard, but I do not understand how the replacement of one single-family home with another single-family home, which complies as a structure with all zoning requirements, including height limitations and mandatory setbacks, increases neighborhood density or diminishes open space in a way contrary to Edgartown's zoning bylaw.

G. L. c. 40A, § 6, fourth par. (first sentence). For these lots, undersized and nonconforming as they may be, the zoning changes largely do not apply.[5] A home of any size (whether 2,400 or 1,200 square feet) can be built on such a lot so long as it complies with other dimensional requirements for such structures, such as height and building coverage limitations. It would be striking indeed to conclude that the Legislature intended that the owner of a nonconforming unimproved lot would have substantially greater protections and rights than a homeowner who might want to add a dormer to a Cape Cod style house, or to enclose a porch or a garage for the purpose of adding a family room, or otherwise to improve a residence that lies on a similarly nonconforming lot.

In concluding otherwise, the concurrence relies on a view of legislative intent drawn from what it describes as the "unanimity of [authoritative] opinion [that] the ultimate objectives of zoning would be furthered by the eventual elimination of non-conformities in most cases," citing the DCA report that was used by the General Court as a resource in fashioning the 1975 zoning act. *Ante* at 859, citing DCA report, *supra* at 39. See note 3, *supra*. This is inconsistent with how the Legislature in fact acted to balance the interest in eliminating nonconformities with the rights of homeowners to improve their existing homes without the expense and uncertainty of obtaining special permits from local zoning boards.

The DCA report, while referencing the aforementioned "unanimity of opinion," also noted the "increasing awareness that the assumption it is desirable to eliminate non-conforming uses may not always be valid." *Id.* at 39, 43. In fashioning its legislative recommendations, the DCA report included a number of mechanisms directed at eliminating such uses, such as

---

[5] General Laws c. 40A, § 6, fourth par. (first sentence), provides: "Any increase in area, frontage, width, yard, or depth requirements of a zoning ordinance or by-law shall not apply to a lot for single and two-family residential use which at the time of recording or endorsement, whichever occurs sooner was not held in common ownership with any adjoining land, conformed to then existing requirements and had less than the proposed requirement but at least five thousand square feet of area and fifty feet of frontage." If a lot is held in common ownership with adjacent lots, other provisions apply. G. L. c. 40A, § 6, fourth par. (second sentence).

authorizing cities and towns to "amortiz[e]" nonconforming uses, to take nonconforming property by eminent domain, and to impose regulations to mitigate the effects of nonconforming uses and structures on their surroundings. *Id.* at 44, 45, 47. All of these proposals were rejected by the Legislature. The DCA report also proposed protecting the owners of nonconforming homes only to the extent of recognizing their right to "perform normal maintenance and repair on non-conforming structures." *Id.* at 44. The narrowness of this protection was rejected by the Legislature as well. Instead, the Legislature added the second "except" clause to the first paragraph of § 6, an addition not recommended by the DCA and nonexistent in prior State zoning law. In so acting, the Legislature rejected the DCA report's objective of "eventual elimination" of nonconforming residential housing, and instead sought to protect such housing by allowing homeowners to "alter[], reconstruct[], exten[d]" or "change" the structures of their homes. G. L. c. 40A, § 6, first par. (first sentence). That protection should not be eviscerated by requiring homeowners to convince local zoning authorities that a proposed home improvement, which does not itself involve any further violation of the zoning ordinance, also does not — in some subjective, aesthetic sense — make an existing nonconformity more unpleasant. This deliberate and pointed action on the part of the Legislature has not been afforded appropriate weight by the concurrence in its interpretation of the statute.[6]

The application of the concurrence's reasoning is not without practical consequence to the multitude of citizens who own homes in cities or towns that, at some recent point, have attempted to limit growth by increasing minimum lot sizes, often

---

[6]The concurrence advances the alternative argument that the second "except" clause provides no protection for the plaintiffs at all, because it speaks only to nonconforming structures or uses and not conforming structures on nonconforming lots. *Ante* at 861-862. As the concurrence firmly rejects such an interpretation of the clause, the argument is a poor response to the plaintiffs' claim that the clause protects their proposal as a reconstruction that does not "increase the nonconforming nature" of the structure. The nature of the nonconformity of the plaintiffs' house is its location on a nonconforming lot, and it is my view, as well as the view of the concurring Justices, see *ante* at 861, that the clause applies to such "nonconforming structures."

dramatically. The need to secure findings or special permits through lengthy, costly, and discretionary local zoning processes for any improvement that might increase the living space or footprint of a home may put such improvements out of reach for many homeowners.[7] Requiring homeowners to run such an administrative gauntlet impedes and burdens the upgrade of a large part of our housing stock, much of which (except perhaps along the water or on the island of Martha's Vineyard) is relatively "affordable." I can find no evidence to support the concurrence's conclusion that the Legislature intended such a result. Rather, all the evidence suggests the contrary, and surely the plain words of the statutory exception do not dictate or require such an outcome. For these reasons, I would reverse the judgment of the Land Court.

---

[7] The concurrence insists that the "rule does not, as a practical matter, make it more costly and difficult to modernize older homes." *Ante* at 860. Yet the concurring Justices would hold that only those homeowners who opt to make changes to structures that "retain[] the size of the original," may proceed with those changes without obtaining a special permit. *Id.* The special permit process without question renders many home improvements more costly and subject to the discretionary determinations of local zoning boards of appeals, which are apparently charged in considering special permit applications with promoting "conformity" and the prevention of "land use anomalies." *Ante* at 861.