ALISON SHEPPARD *vs.* ZONING BOARD OF APPEAL OF BOSTON
& another.[1]

No. 10-P-2070.

Suffolk. December 5, 2011. - March 7, 2012.

Present: GREEN, VUONO, & MILKEY, JJ.

*Zoning,* Variance, Person aggrieved.

This court declined to consider a property owner's challenge to an abutter's standing as a person aggrieved to maintain an appeal of a zoning variance granted to the property owner by a municipal board of appeal (board), where this court, in a previous appeal from a Superior Court judge's decision upholding the board's action, concluded that the abutter had established such standing. [397-398]

A Superior Court judge erred in upholding a decision of a municipal board of appeal granting a zoning variance to a real property owner, permitting the property owner to reconstruct a residence on a nonconforming undersized lot, where, given that the reconstruction increased the size of the previous structure on the lot such that the existing nonconformity was intensified to an extent that was not de minimis, the property owner failed to establish that the variance was the minimum variance that would allow for reasonable use of the property, i.e., a home of the size and configuration of the old house. [398-403]

In a civil action brought by an abutter challenging a variance granted by a municipal board of appeal to a neighboring real property owner (allowing the neighboring property owner to reconstruct a residence on a nonconforming undersized lot), there was no basis in the trial record for a claim by that property owner that the board's denial of the relief he requested would have amounted to unlawful discrimination under G. L. c. 40A, § 3, against a person with a disability. [403-405]

In remanding a civil action in which this court determined that a real property owner was not entitled to a zoning variance that had been granted by a municipal board of appeal, this court declined to direct that the structure in question be torn down. [405-407]

CIVIL ACTION commenced in the Superior Court Department on January 21, 1999.

---

[1]Robert K. McGarrell.

After review by this court, 74 Mass. App. Ct. 8 (2009), further proceedings were had before *John C. Cratsley*, J.

*John J. Russell* for the plaintiff.

*George R. Jabour* for Robert K. McGarrell.

*Adam Cederbaum*, Assistant Corporation Counsel, for zoning board of appeal of Boston.

MILKEY, J. On December 8, 1998, defendant zoning board of appeal of Boston (board) granted five variances to defendant Robert K. McGarrell to build a single-family home of a certain size and configuration on a lot he owned in the South Boston section of Boston. Plaintiff Alison Sheppard, an immediate abutter, filed an action challenging these variances pursuant to § 11 of the Boston zoning enabling act, St. 1956, c. 665, as amended through St. 1993, c. 461, § 5. She now appeals a decision by a Superior Court judge affirming the board's actions. We reverse and remand for further proceedings consistent with this opinion.

*Background.* We summarize the facts from the record.[2] In 1997, McGarrell purchased a 2,600-square-foot lot at 65 P Street in South Boston. The lot is only twenty-six feet wide by one hundred feet deep, a size and shape that is typical of the neighborhood. As the judge found, "all the lots in the neighborhood are long and narrow, with insufficient frontage or width to build a conforming structure."

When McGarrell purchased the property, there was an existing single-family, bungalow-style home there. The construction of that house (the old house) predated the Boston zoning code. A portion of the old house was one story tall, another portion was two stories, and a portion was effectively three stories (given that the lot sloped significantly from front to back, and the basement floor opened at ground level to the back yard). McGarrell knew that the old house was dilapidated, and he intended to tear it down to the studs and rebuild it. However, after he obtained a building permit and began his renovation project, he discovered that the house was in worse shape than

---

[2]Although there was a three-day bench trial, many of the key underlying facts were established by stipulation. The facts set forth below are drawn from the trial judge's findings, supplemented by the parties' stipulation, documentary evidence appended to that stipulation (or that was otherwise uncontested), and concessions the parties made on the record.

he had thought and that its foundation was crumbling. As a result, the old house had to be razed and a new house built from scratch.

Given the size and shape of the lot, any replacement home would necessarily violate existing dimensional zoning requirements in various respects. Nevertheless, as the parties stipulated, McGarrell could have reconstructed the old house as of right, because it was a preexisting nonconforming structure. As Sheppard acknowledged at oral argument, this could have been accomplished through reliance on the preexisting, nonconforming structure provisions of the Boston zoning code (included in what is known as article 9). In fact, according to the board, article 9 potentially allows for some expansions of existing prior nonconforming structures, subject to certain limitations.[3] However, apparently because the house was torn down, the board took the position that McGarrell could not make use of article 9 (even if he simply wanted to reconstruct the old house), but instead needed to pursue variances.

Without obtaining any additional approvals, McGarrell began building a new house that was larger than the old one. After Sheppard complained, the city of Boston enjoined construction, and McGarrell sought approval for the larger house. The Boston inspectional services department denied approval (given that the proposal did not meet existing zoning requirements), and in accordance with the board's instructions, McGarrell then applied for five variances to allow his proposed house to be built. Although the board granted the requested variances for his submitted plans, McGarrell eventually abandoned those plans and revised them to respond to some of the concerns that Sheppard had raised. Under the revised plans, the house would still be larger in certain respects than the old house. The maximum width of the house would be the same as before, but more of the house would now be of that width (given a change of con-

---

[3]McGarrell has appended what purports to be a copy of article 9 to his brief. Since this portion of the zoning code was apparently not introduced in evidence below, it is not properly before us. See *Russell* v. *New Bedford*, 74 Mass. App. Ct. 715, 722 (2009), quoting from *Fournier* v. *Central Taxi Cab, Inc.*, 331 Mass. 248, 249 (1954) (municipal ordinances and by-laws not subject to judicial notice; "[n]either a trial judge nor this court can consider such alleged ordinances [or by-laws] unless they are put in evidence").

figuration of the house).[4] The front of the new structure would be approximately three or four feet closer to the front property line, and the house would extend approximately four feet deeper into the lot (bringing it closer to Sheppard's three-decker house, which abuts the southwestern corner of the McGarrell house). The main respect in which the new house would be larger was its mass, with the new, townhouse-style home having a full second story (under a flat roof) over virtually its entire footprint (with a basement floor opening up to the back yard, as before).

The board again granted McGarrell the variances he sought, and Sheppard brought the current action. After she unsuccessfully sought a preliminary injunction to enjoin construction, McGarrell built his proposed house.[5] Following a three-day trial in 2004, the judge concluded that Sheppard lacked standing and issued a judgment dismissing her appeal. We reversed and remanded for a decision on the merits. *Sheppard* v. *Zoning Bd. of Appeal of Boston*, 74 Mass. App. Ct. 8 (2009). Relying on the existing trial record, the judge upheld the decision of the board after concluding that all of the variance requirements had been met.

*Discussion. Standing.* Based upon the Supreme Judicial Court's recent decision in *Kenner* v. *Zoning Bd. of Appeals of Chatham*, 459 Mass. 115 (2011) (*Kenner*), McGarrell urges us to revisit our decision on standing in the earlier appeal. We decline to do so. In sum, especially in light of the fact that the standing issues in *Kenner* arose in a different context,[6] this is not one of those rare instances where reopening an issue resolved in a prior

---

[4]A portion of the south side of the old house extended all the way to the lot line, while a portion was offset over eight feet from the lot line (as compared to the ten-foot sideyard set back required by the code). After the renovation, the entire south side of the house extended to the lot line.

[5]McGarrell acknowledged at trial that he proceeded with construction at his risk.

[6]Primarily at issue in *Kenner* was the extent to which a seven-foot-taller home would affect both the plaintiffs' view of the ocean from their own home and "the visual character of their neighborhood." 459 Mass. at 121. The court concluded that the plaintiffs "did not put forth credible facts to support their allegation that the increased height of [the defendants'] new house will block their view of the ocean," and that "apart from [the plaintiffs'] unsubstantiated claims and personal opinions, there was no evidence that the increased height of [the defendants'] new house would have a detrimental impact on the visual character of their neighborhood, the interest that the zoning by-law is designed

appeal is necessary to prevent "manifest injustice." See *King* v. *Driscoll*, 424 Mass. 1, 7-8 (1996), quoting from *United States* v. *Rivera-Martinez*, 931 F.2d 148, 151 (1st Cir.), cert. denied, 502 U.S. 862 (1991). See also *Reilly* v. *Local 589, Amalgamated Transit Union*, 31 Mass. App. Ct. 633, 641-642 (1991).

*Merits.* Under the applicable section of the Boston zoning code, a variance may be granted only if three conditions have all been met.[7] *Steamboat Realty, LLC* v. *Zoning Bd. of Appeal of Boston*, 70 Mass. App. Ct. 601, 603 n.5 (2007). As the party who had sought the variances, McGarrell bore the burden at trial of proving his entitlement to them. *39 Joy St. Condominium Assn.* v. *Board of Appeal of Boston*, 426 Mass. 485, 488 (1998). In reviewing the trial judge's decision, we are mindful that "[n]o person has a legal right to a variance and they are to be granted sparingly," since if they "are granted with undue

---

to protect." *Ibid.* This case, by contrast, deals with a crowded urban neighborhood, a context in which our case law makes clear that additional "crowding of an abutter's residential property by violation of the density provisions of the zoning by-law will generally constitute harm sufficiently perceptible and personal to qualify the abutter as aggrieved." *Sheppard* v. *Zoning Bd. of Appeal of Boston*, 74 Mass. App. Ct. 8, 12 (2009), quoting from *Dwyer* v. *Gallo*, 73 Mass. App. Ct. 292, 297 (2008).

[7]Specifically, these conditions are as follows:

> "(a)  That there are special circumstances or conditions, fully described in the findings, applying to the land or structure for which the variance is sought (such as, but not limited to, the exceptional narrowness, shallowness, or shape of the lot, or exceptional topographical conditions thereof) which circumstances or conditions are peculiar to such land or structure but not the neighborhood, and that said circumstances or conditions are such that application of the provisions of this code would deprive the appellant of the reasonable use of such land or structure;

> "(b)  That, for reasons of practical difficulty and demonstrable and substantial hardship fully described in the findings, the granting of the variance is necessary for the reasonable use of the land or structure and that the variance as granted by the Board is the minimum variance that will accomplish this purpose; [and]

> "(c)  That the granting of the variance will be in harmony with the general purpose and intent of this code, and will not be injurious to the neighborhood or otherwise detrimental to the public welfare . . . ."

Boston Zoning Code, art. 7, § 7-3.

frequency or liberality, and without strict compliance with the prescribed statutory criteria, zoning regulations can become a matter of administrative whim." *Damaskos* v. *Board of Appeal of Boston*, 359 Mass. 55, 61-62 (1971).

The size and shape of McGarrell's lot present its principal limitations. However, as the judge below recognized, those "conditions" are not "peculiar to McGarell's lot" but are instead shared by all the other lots "in the neighborhood." Therefore, under the express terms of the Boston zoning code, the lot's dimensional limitations cannot serve as the basis for a variance. See *Feldman* v. *Board of Appeal of Boston*, 29 Mass. App. Ct. 296, 297 (1990) (variances typically not available due to a failure to meet dimensional requirements).

The "peculiar" condition on which the judge relied was the dilapidated condition of the old house.[8] This type of condition would not justify a variance pursuant to G. L. c. 40A, § 10, but as the judge recognized, the provisions of the Boston zoning code are somewhat more forgiving as to what sorts of "peculiar" circumstances or conditions would qualify.[9] However, assuming

---

[8]Although the judge did not focus on the issue, there was also evidence regarding some apparently unique soil conditions on the parcel. However, Mc-Garrell presented no evidence of how such soil conditions affected the size of the house, so the existence of the "peculiar" soil conditions offers no additional help.

McGarrell additionally maintained that his chronic emphysema created a hardship that justified the variances. As a general matter, a hardship resulting from a personal condition or characteristic of the owner (rather than from conditions affecting the land itself) is not a valid basis for a variance. "[A] variance applies to the land rather than to its current owner, and . . . runs with the land when it is conveyed to [another] person." *Huntington* v. *Zoning Bd. of Appeals of Hadley*, 12 Mass. App. Ct. 710, 716 (1981), quoting from 3 Anderson, American Law of Zoning § 18.64, at 311 (2d ed. 1977). For this reason, a variance should be granted "based only upon circumstances which directly affect the real estate and not upon circumstances which cause personal hardship to the owner." *Huntington, supra* at 715. This general rule applies not only to personal financial hardships, but also to hardships occasioned by the poor health of the owner. *Aronson* v. *Board of Appeals of Stoneham*, 349 Mass. 593, 595 (1965). *Winn* v. *Board of Appeals of Saugus*, 358 Mass. 804, 805 (1970). *Paulding* v. *Bruins*, 18 Mass. App. Ct. 707, 711 (1984). See generally 8 Rohan, Zoning Land Use & Controls § 43.02[4][b][ii] (2011); 3 Yokley, Zoning Law & Practice § 20-11 (4th ed. 2008). As to whether McGarrell's emphysema might justify zoning relief on other grounds, see discussion *infra*.

[9]Pursuant to G. L. c. 40A, § 10, the circumstances requiring a variance must relate to "the soil conditions, shape or topography of such land or

that the condition of the house would qualify as the basis for a variance, McGarrell still needs to prove that "for reasons of practical difficulty and demonstrable and substantial hardship . . . the granting of the variance is necessary for the reasonable use of the land or structure and that the variance as granted by the Board is the minimum variance that will accomplish this purpose." Boston Zoning Code, art. 7, § 7-3(b). By definition, proposed construction would require the "minimum" variances needed to allow for a reasonable use, only if it caused the least divergence from applicable zoning requirements necessary to allow for such a use.

It is uncontested that McGarrell purchased the property for the very purpose of living there in a home of the size and configuration of the old house. This establishes a baseline for reasonable use of the property, absent proof of what change in circumstances rendered the former intended use of the property no longer reasonable. See *Steamboat Realty, LLC* v. *Zoning Bd. of Appeal of Boston*, 70 Mass. App. Ct. at 606 (upholding denial of variance where "Steamboat does not assert that the building, in its preexisting condition, was inadequate for reasonable uses such that failure to grant an exception could be considered unreasonable").[10] McGarrell offered no such proof, nor did he make any showing that building a larger house was necessitated by his having to tear down the old one.[11] Instead, the record reflects only his understandable preference for a larger home.

---

structures," while under the Boston zoning code, the requisite special circumstances are referenced "such as, but not limited to, the exceptional narrowness, shallowness, or shape of the lot, or exceptional topographical conditions thereof." Boston Zoning Code, art. 7, § 7.3 (a).

[10]Compare *Lombard* v. *Board of Appeal of Wellesley*, 348 Mass. 788, 789 (1965), where, in the context of an appeal of the denial of a special permit for the minor expansion of a prior nonconforming structure (a garage that had been constructed in 1937), the owner showed that the expansion was necessary in order to accommodate the width of modern cars. Although there was some limited testimony here that at least one aspect of the interior of the building (the slope of the stairs) might need to be modified because of the building code, there was no testimony that this required the house to be larger.

[11]While McGarrell testified that he had to borrow more money once he learned that the old house had to be torn down, he offered no evidence that the lender had insisted that the new house be larger, or that constructing a house the size of the old one otherwise would have been economically infeasible. Compare *Marashlian* v. *Zoning Bd. of Appeals of Newburyport*, 421 Mass.

In light of McGarrell's failure to demonstrate that he could make a reasonable use of the property only by building a larger house, the construction of the larger house would require more than the "minimum variance" needed for a reasonable use if it would increase noncompliance with the zoning code. The judge recognized that the larger house would in fact increase the existing nonconformities. However, he ultimately deemed these increases inconsequential, because he concluded that the new house was only "slightly larger in size" and that "the expansion is not significant." In coming to that conclusion, the judge accurately referred to the increased average height of the building as "the most significant area of expansion in the new structure." Nevertheless, he discounted this vertical expansion because he concluded that — given that the new house still did not exceed the maximum height allowed under the zoning code — it "could have been accomplished as a matter of right under the code." With regard to the expanded footprint of the house,[12] the judge concluded that "[a]s these extensions of the footprint have relatively no impact on the surrounding neighborhood, I find them to be *de minimis*."

The judge committed an error of law when he concluded that McGarrell could expand the house vertically as matter of right. Because the lot was undersized, any house there violated the minimum lot size requirement. In such a circumstance, an increase in the size of an existing building could "intensify" the nonconformity (regardless of the extent to which the new house complied with setback or height requirements). See *Bjorklund* v. *Zoning Bd. of Appeals of Norwell*, 450 Mass. 357, 360-361 (2008) (*Bjorklund*).[13] A property owner may not intensify an existing nonconformity as of right.

To be sure, the Supreme Judicial Court has recognized that

---

719, 726 (1996) (variance from requirement that hotel provide certain number of parking spaces upheld in part on grounds that full compliance would have been "economically impractical").

[12]The judge found that the footprint of the new house "is the exact same width as the old structure." This is an accurate statement insofar as it refers to the maximum width of the two structures, but it is misleading to the extent that it implies that the average width of the house did not change. See note 4, *supra*.

[13]*Bjorklund* was decided under G. L. c. 40A, but the defendants have not demonstrated why a different rule would apply to the Boston zoning code. See *McGee* v. *Board of Appeal of Boston*, 62 Mass. App. Ct. 930, 930 (2004).

some changes, such as the construction of a dormer, are so slight that they "could not reasonably be found to increase the nonconforming nature of a structure." *Bjorklund*, 450 Mass. at 362-363.[14] The increased height and mass of the building here cannot fairly be characterized in that light. This is true not only with regard to the building's height, but also with regard to its expanded footprint. Pointing to the plans submitted in evidence, Sheppard maintains that the footprint of the foundation has increased by some thirty percent.[15] Although there is some room for debate as to how such a calculation should be done, even the calculation most favorable to McGarrell appears to show an increase in the house's footprint of more than ten percent. Moreover, the changes that McGarrell made did not merely "intensify" noncompliance with the lot size requirement; they directly increased the building's noncompliance with applicable setback and sideyard requirements. For example, whereas almost one-half of the south side of the old house came close to meeting the sideyard setback requirement (eight and one-half feet instead of the required ten), the entirety of that side of the new house now extends all the way to the lot line.[16] Regardless of whether such changes might ultimately be approvable,[17] they cannot be ignored as "de minimis."[18] See *Arrigo* v. *Planning Bd. of Franklin*, 12 Mass. App. Ct. 802, 804 (1981)

[14]Indeed, in *Bjorklund*, the court concluded that such changes would not amount to intensifications "as matter of law." 450 Mass. at 363.

[15]McGarrell filed a motion to strike Sheppard's reply brief, claiming that it is "nothing more than an attempt to introduce before the Appeals Court evidence and Sheppard's self-serving analysis of this evidence, which was not introduced below." The "evidence" in the reply brief (diagrams of the footprints of the old and new houses) appears in substance in the trial record. The motion to strike is denied.

[16]In addition, the south side of the house was expanded deeper into the lot.

[17]At oral argument, the board represented that, where article 9 of the Boston zoning code applies, it can potentially allow expansion of a preexisting nonconforming structure up to a certain percentage increase. The board also stated that it is unable to formulate a position on whether the specific expansion of the house here could qualify under article 9 without going through the requisite article 9 procedures. The specifics of article 9 and whether the new house could meet them are not currently before us. However, the fact that such a provision exists underscores the ill fit of the variance process here. Although the limitations of the record prevent a precise determination, it appears at least possible that the expansion the board asks us to treat as "insignificant" for purposes of endorsing its variance, would exceed the

(rejecting argument that a 6.68 percent deviation from a frontage requirement was de minimis). See also *Steamboat Realty*, 70 Mass. App. Ct. at 602 n.4, 606 (height differential of "at least four feet" not de minimis).

In sum, the judge erred in concluding that the variances the board granted were the "minimum" necessary to allow for a reasonable use of the property, and the board therefore acted in excess of its authority when it granted the variances.

*Alleged discrimination.* McGarrell has chronic emphysema, and when he applied to the board for his variances, he asserted that the requested relief would allow "a dwelling suitable to [his] medical needs." The board did not rely on his health issues in granting the variances, but it did note that the proposed home "meets the special medical needs of [McGarrell]." At trial, McGarrell offered some evidence that the new house was better suited to his medical condition than the old house, e.g., testimony by McGarrell's wife that the open floor plan of the new house made it easier for him to navigate the house with his oxygen tank. The judge did not reference such testimony in his findings, nor did he rely on McGarrell's medical issues in ruling that the variances were properly issued. Whether such silence

percentage limit applicable under the Boston zoning code to expansions of nonconforming structures.

[18]We recognize that the Supreme Judicial Court has indicated that a trial court judge's determination that a zoning impact was "de minimis" is generally entitled to great deference. Cf. *Kenner*, 459 Mass. at 123 (where trial "judge stated that the evidence showed that the increased height of the new house would have a de minimis impact on the [plaintiffs'] view of the ocean," and the judge had the benefit of taking a view, "we cannot conclude that [his] ultimate finding that the [plaintiffs] were not aggrieved persons . . . was clearly erroneous"). However, the judge here was explicit that he found the increased footprint of the house "de minimis" based on his determination that the expansion had "relatively no impact on the surrounding neighborhood." That consideration is relevant only to the third requirement for granting a variance. See note 7, *supra*. To the extent the judge's conclusion that the expansion was "de minimis" can be seen as a factual finding that the variances granted were indistinguishable from the minimum necessary variances, that finding is inconsistent with the judge's subsidiary findings about the differences between the old house and the new house, and we accordingly are not bound by it. See *Simon* v. *Weymouth Agric. & Industrial Soc.*, 389 Mass. 146, 151-152 (1983). Compare *Capodilupo* v. *Vozzella*, 46 Mass. App. Ct. 224, 227 (1999) (where there was actual encroachment of only few inches, this was determined to be "spatially inconsequential" and "truly de minimis").

was intended or not, the judge's declining to justify the variance based on a personal hardship of the property owner is consistent with the case law. See note 8, *supra*. On appeal, McGarrell argues that such cases are no longer good law, because they fail to take into account the 1989 enactment of language now appearing in G. L. c. 40A, § 3, that prohibits municipalities from discriminating against those with disabilities.[19]

Viewed in its best light, McGarrell's argument appears to be that, if construction of the larger home was necessary to accommodate a disability, then insisting on strict compliance with the zoning requirements would amount to unlawful "discrimination" under c. 40A, § 3. Such an argument finds some support in case law under the analogous Federal statute. See, e.g., *Howard* v. *Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (Federal Fair Housing Act "creates an affirmative duty on municipalities . . . to afford [their] disabled citizens reasonable accommodations in [their] municipal zoning practices if necessary to afford such persons equal opportunity in the use and enjoyment of their property").[20] In this manner, McGarrell's argument is not really that the board could have taken his medical condition into account in assessing whether the specified requirements for obtaining variances had been met; rather, it is that the board could not deny him the relief he requested without violating its obligations under G. L. c. 40A, § 3.

Wherever the boundaries of the protections offered by G. L. c. 40A, § 3, may lie (something we need not and should not resolve here), McGarrell cannot in any event make out a claim

---

[19]The pertinent language, which was inserted by St. 1989, c. 106, states that "local land use and health and safety laws, regulations, practices, ordinances, by-laws and decisions of a city or town shall not discriminate against a disabled person." This language was made specifically applicable to all municipalities, including Boston.

[20]The Federal Fair Housing Amendments Act, 42 U.S.C. § 3604(f), which was enacted the year before the relevant language was added to G. L. c. 40A, § 3, makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap," § 3604(f)(1), and defines "discrimination" to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." § 3604(f)(3)(B).

for "discrimination" based on the trial record.[21] When he purchased the property, McGarrell intended to live in the old house after it was renovated. Although there was testimony that certain aspects of the new house's interior were designed with an eye toward McGarrell's condition, there was no testimony that the house's extended footprint and increased height were necessary to enable him to live there. Under these circumstances, McGarrell cannot make out a claim that he was denied an equal opportunity to enjoy the housing of his choice as a result of a disability. Compare *Howard* v. *Beavercreek*, 276 F.3d at 806 ("In order to prove that an accommodation is 'necessary,' plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice").

*Remedy.* With McGarrell having failed to prove his entitlement to the variances he had sought, Sheppard urges us to remand this case with a directive that the house be torn down. We decline to do so.

The case law recognizes that tear down orders do not necessarily follow every determination of a zoning violation, and that a court may consider equitable factors and the potential availability of money damages as an appropriate alternative remedy. See *Marblehead* v. *Deery*, 356 Mass. 532, 537-538 (1969); *Kelloway* v. *Board of Appeal of Melrose*, 361 Mass. 249, 256-257 (1972). See also *Cottone* v. *Cedar Lake, LLC*, 67 Mass. App. Ct. 464, 472 (2006); *Steamboat Realty, LLC* v. *Zoning Bd. of Appeal of Boston*, 70 Mass. App. Ct. at 605-606. The particular trajectory of this case makes deferring a decision on remedy especially appropriate. Notably, this is not a case where the public entity administering the applicable zoning requirements is seeking enforcement. Instead, the board has consistently supported the construction of McGarrell's new house, which replaced a dilapidated home that the board determined was both an eyesore and a health hazard. In addition, as noted above, Sheppard has acknowledged that McGarrell could have rebuilt the old house as of right under article 9. Moreover, the defend-

---

[21]For purposes of our analysis, we assume arguendo that McGarrell is a "disabled person" within the meaning of the statute and that the requested variances would be a "reasonable accommodation" of his disability.

ants assert that article 9 potentially allows for some expansion of preexisting nonconforming structures, and Sheppard actually does not appear to argue to the contrary. Instead, she maintains that — with McGarrell having gone so far down the variance path — it is too late for him to change theories now. See *Warren* v. *Board of Appeals of Amherst*, 383 Mass. 1, 8-9 (1981) (party who had sought approval for a project only through a variance cannot be heard to argue for first time on appeal that he could have built project "as of right").

There are two problems with Sheppard's position. First, this is not a case where a party is being allowed for the first time on appeal to raise an alternative argument to try to justify the zoning relief he seeks on the merits; instead, we consider the potential availability of an alternative path here only with respect to Sheppard's request that we order the house to be torn down. Second, this is not a case where an owner freely chose the variance path. Rather, it was the board that insisted that McGarrell seek variances despite the obvious ill fit between that option and McGarrell's situation. That insistence was apparently based on the board's position that property owners cannot invoke article 9 where they are razing existing structures. The validity of the board's position on this issue is not currently before us, but we do note that in the analogous context of G. L. c. 40A, § 6, the Supreme Judicial Court has implicitly recognized "that a single family residence may be constructed in replacement of a pre-existing nonconforming residence, even if it increases or intensifies the nonconformities, upon a finding that the new structure will not be substantially more detrimental to the neighborhood." *Eastern Point, LLC* v. *Zoning Bd. of Appeals of Gloucester*, 74 Mass. App. Ct. 481, 491 (2009) (Green, J., concurring), citing to *Bransford* v. *Zoning Bd. of Appeals of Edgartown*, 444 Mass. 852, 862-863 (2005) (Greaney, J. concurring). *Bjorklund*, 450 Mass. at 360-361. In any event, for all we know based on the current record, it might be possible for the board to approve the defendant's house under a different provision of the zoning code (with or without some physical changes).[22] Under these circumstances, we agree with McGarrell that a tear

---

[22]The parties have also alluded to provisions of the zoning code, in addition to article 9, that may be relevant. Further, when pressed at oral argument as to

down order would be premature. In the event that McGarrell seeks relief from the board pursuant to a different provision of the Boston zoning code, we leave it to the discretion of the Superior Court judge whether to stay further proceedings in the current litigation while the board considers such a request.

*Conclusion.* For the reasons set forth above, we reverse the judgment affirming the board's grant of the variances and remand for further proceedings consistent with this opinion.

*So ordered.*

---

whether existing dimensional zoning requirements made sense in areas such as South Boston that are made up predominantly of undersized lots, the board responded that the relevant Boston body was in the process of a comprehensive reexamination of such issues.